No. 13-1481

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

LORI FREEMAN,

                                          Plaintiff-Appellant,

    v.

DAL-TILE CORPORATION,

                                          Defendant-Appellee.

_____

On Appeal from the United States District Court
for the Eastern District of North Carolina
_____

## BRIEF OF APPELLANT LORI FREEMAN
_____

Anne W. King
Brian Wolfman
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
(202) 662-9546

*Counsel for Appellant*

October 4, 2013

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 13-1481    Caption: Lori Freeman v. Dal-Tile Corporation

Pursuant to FRAP 26.1 and Local Rule 26.1,

Lori Freeman                who is        appellant        , makes the following disclosure:
(name of party/amicus)           (appellant/appellee/amicus)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
2.   Does party/amicus have any parent corporations?   ☐ YES ☑ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent
     corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
***************************

I certify that on    October 4, 2013    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s Anne W. King                                      10/4/2013
(signature)                                          (date)

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS ............................................................................... ii

TABLE OF AUTHORITIES ......................................................................... v

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES .......................................................................... 1

STATEMENT OF THE CASE ...................................................................... 2

    I.   Administrative exhaustion ............................................................. 2

    II.   Complaint ..................................................................................... 3

    III.   Decision below ............................................................................. 4

STATEMENT OF FACTS ........................................................................... 5

    I.   Introduction .................................................................................. 5

    II.   Employment background ............................................................... 6

    III.   Harassment and complaints .......................................................... 7

      A.   Timothy Koester's harassment and Lori Freeman's complaints .............. 7

      B.   An atmosphere of omnipresent harassment ......................................... 12

        1.   "Evening excursions" ................................................................. 12

        2.   "Bitches" .................................................................................. 14

        3.   Racist jokes and comments ......................................................... 15

    IV.   Dal-Tile's failed response .............................................................. 16

      A.   Dal-Tile's first response to Koester's harassment came three years after the harassment started. ............................................................. 16

B.   Dal-Tile backpedaled on banning Koester.................................................18

C.   VoStone's intervention.................................................................................20

D.   Ostracism by Wrenn and further contact from Koester ..........................21

E.   Dal-Tile officially allowed Koester to return, exacerbating Freeman's emotional distress....................................................................................22

V.   Impact of the harassment ....................................................................................24

VI.  Dal-Tile's destruction of evidence ......................................................................26

SUMMARY OF THE ARGUMENT ..........................................................................29

ARGUMENT ..................................................................................................................31

I.   Standard of review ................................................................................................31

II.  Hostile work environment .................................................................................31

A.   A reasonable jury could conclude that Freeman was subjected to a racially and sexually hostile work environment. ....................................31

1.   The district court erred in failing to consider the cumulative effect of combined racial and sexual harassment.................................32

2.   A reasonable jury could find that Freeman was subjected to severe or pervasive harassment because of her sex and race. ...........................34

a.   Koester's harassment of Freeman was severe and humiliating. ...........34

b.   Koester's harassment was pervasive.....................................................36

c.   The district court failed to consider the cumulative effect of Koester's harassment................................................................................38

B.   A reasonable jury could find that liability for Koester's harassment is imputable to Dal-Tile. ...............................................................................39

1.  Dal-Tile had actual or constructive knowledge of Koester's harassment of Freeman. ........................................................40

   a.  Actual knowledge ................................................................40

   b.  Constructive knowledge........................................................43

2.  Dal-Tile did not take immediate and appropriate action to end the harassment.........................................................................44

   a.  Dal-Tile's response to the harassment was neither prompt nor adequate.............................................................................44

   b.  Dal-Tile should have prohibited Koester from entering or contacting the Raleigh branch. .............................................................46

   c.  Dal-Tile's response was ineffective in preventing contact between Freeman and Koester. ........................................................47

C.  Freeman is entitled to an inference of spoliation, which provides another reason to deny summary judgment. .........................................48

III.  Constructive discharge ....................................................................50

A.  Freeman has raised a question of fact as to whether her work environment was objectively intolerable. ..................................50

B.  A reasonable jury could infer that Dal-Tile intended to force Freeman to resign. ..............................................................................52

IV.  Obstruction of justice .......................................................................54

CONCLUSION...................................................................................59

REQUEST FOR ORAL ARGUMENT ...................................................................

CERTIFICATE OF COMPLIANCE.......................................................................

STATUTORY ADDENDUM ...............................................................................

iv

# TABLE OF AUTHORITIES

## CASES

*Adler v. Wal-Mart Stores, Inc.*,
    144 F.3d 664 (10th Cir. 1998) .................................................................40

*Amirmokri v. Balt. Gas & Elec. Co.*,
    60 F.3d 1126 (4th Cir. 1995) .............................................................. 52-53

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................31

*Ayissi-Etoh v. Fannie Mae*,
    712 F.3d 572 (D.C. Cir. 2013)................................................................35

*Blackburn v. Carbone*,
    703 S.E.2d 788 (N.C. Ct. App. 2010)................................................ 55-56

*Breda v. Wolf Camera & Video*,
    222 F.3d 886 (11th Cir. 2000) ...............................................................41

*Buckley v. Mukasey*,
    538 F.3d 306 (4th Cir. 2008) .................................................................49

*Delph v. Dr. Pepper Bottling Co. of Paragould*,
    130 F.3d 349 (8th Cir. 1997) .................................................................35

*Earp v. Quinlan*,
    2010 WL 3001521 (N.C. Ct. App. 2010) ..............................................54

*EEOC v. Cent. Wholesalers*,
    573 F.3d 167 (4th Cir. 2009) ..............................................32, 34-35, 45-46

*EEOC v. Cromer Food Servs., Inc.*,
    414 F. App'x 602 (4th Cir. 2011).........................................................39

*EEOC v. Sunbelt Rentals*,
    521 F.3d 306 (4th Cir. 2008) .......................................................37, 41, 46

*EEOC v. Xerxes Corp.*,
 639 F.3d 658 (4th Cir. 2011) ...................................................... 41, 44-45, 47

*Evans v. Techs. Applications & Serv. Co.*,
 80 F.3d 954 (4th Cir. 1996) ........................................................................31

*Faragher v. City of Boca Raton*,
 524 U.S. 775 (1998)....................................................................................38

*Grant v. High Point Reg'l Health System*,
 645 S.E.2d 851 (N.C. Ct. App. 2007)..................................................... 55-56

*Harris v. Forklift Sys., Inc.*,
 510 U.S. 17 (1993)........................................................................... 32, 34-35

*Harris v. L&L Wings, Inc.*,
 132 F.3d 978 (4th Cir. 1997) ......................................................................41

*Henry v. Deen*,
 310 S.E.2d 326 (N.C. 1984) .................................................................. 55-56

*Hoyle v. Freightliner, LLC*,
 650 F.3d 321 (4th Cir. 2011) ......................................................................44

*Jennings v. Univ. of N.C.*,
 482 F.3d 686 (4th Cir. 2007) ......................................................................36

*Katz v. Dole*,
 709 F.2d 251 (4th Cir. 1983) ......................................................................43

*In re Kivett*,
 309 S.E.2d 442 (N.C. 1983) ................................................................. 54-55

*Kronisch v. United States*,
 150 F.3d 112 (2d Cir. 1998) .......................................................................48

*La Grande v. DeCrescente Distrib. Co.*,
 370 F. App'x 206 (2d Cir. 2010)..................................................................35

*Lieb v. Mayer*,
    94 S.E.2d 658 (N.C. 1956) ............................................................58

*Mosby-Grant v. City of Hagerstown*,
    630 F.3d 326 (4th Cir. 2010) .......................................... 32-33, 35

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002)..............................................................39, 43

*Norwood v. Carter*,
    87 S.E.2d 658 (N.C. 1955) ............................................................58

*Ocheltree v. Scollon Prods., Inc.*,
    335 F.3d 325 (4th Cir. 2003) ................................................ 43-44

*Olivetti Corp. v. Ames Bus. Sys., Inc.*,
    356 S.E.2d 578 (N.C. 1987) ........................................................58

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998)................................................................32, 34

*Pennsylvania State Police v. Suders*,
    542 U.S. 129 (2004)..............................................................50, 53

*Powell v. Town of Sharpsburg*,
    591 F. Supp. 2d 814 (E.D.N.C. 2008) ............................. 49, 56-57

*Rodgers v. W.-S. Life Ins. Co.*,
    12 F.3d 668 (7th Cir. 1993) ........................................................35

*Silvestri v. Gen. Motors Corp.*,
    271 F.3d 583 (4th Cir. 2001) ......................................................56

*Spriggs v. Diamond Auto. Glass*,
    242 F.3d 179 (4th Cir. 2001) ........................................31, 35, 38

*State v. Dietze*,
    660 S.E.2d 197 (N.C. Ct. App. 2008)..........................................56

*State v. Wilkerson*,
    247 S.E.2d 905 (N.C. 1978) ..........................................................................55

*Swentek v. USAIR*,
    830 F.2d 552 (4th Cir. 1987) ........................................................................40

*Tawwaab v. Va. Linen Serv., Inc.*,
    729 F. Supp. 2d 757 (D. Md. 2010)..............................................................35

*Vance v. Ball State Univ.*,
    133 S. Ct. 2434 (2013)..................................................................................50

*Vodusek v. Bayliner Marine Corp.*,
    71 F.3d 148 (4th Cir. 1995) ..........................................................................48

*Walker v. Ford Motor Co.*,
    684 F.2d 1355 (11th Cir. 1982) ....................................................................38

*Watson v. Blue Circle, Inc.*,
    324 F.3d 1252 (11th Cir. 2003) ....................................................................40

*Whitten v. Fred's, Inc.*,
    601 F.3d 231 (4th Cir. 2010) ............................................................ 50-51, 53

*Williamson v. City of Houston*,
    148 F.3d 462 (5th Cir. 1998) ........................................................................41

*Zubulake v. UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003)..................................................................57

## STATUTES, REGULATIONS, AND RULES

42 U.S.C. § 1981 ................................................................................................ 1-2

42 U.S.C. § 2000e *et. seq.*..................................................................................1

29 C.F.R. § 1604.11(e)......................................................................................39

# MISCELLANEOUS

67 C.J.S. *Obstructing Justice* (1978) ................................................................ 54-55

B. Lindemann & P. Grossman, *Employment Discrimination Law* (3d ed. 1996) ........................................................................................................43

## JURISDICTIONAL STATEMENT

Appellant Lori Freeman brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, 42 U.S.C. § 1981, and North Carolina common law in the District Court for the Eastern District of North Carolina against Dal-Tile Corporation, a subsidiary of Mohawk Industries, Inc., VoStone, Inc., and Timothy Koester. Freeman subsequently dismissed VoStone and Koester, JA 4, 11, 14, leaving Dal-Tile as the sole defendant. The district court had jurisdiction over Freeman's federal claims under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 2000e-5(f) and over her state-law claim under 28 U.S.C. § 1367. On March 14, 2013, the district court granted summary judgment to Dal-Tile, disposing of all claims of all parties. JA 641. On April 12, 2013, Freeman filed a notice of appeal. JA 642. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.  Whether the district court erred in holding that no reasonable jury could find that Dal-Tile maintained a hostile work environment based on race or sex.

2.  Whether the district court erred in holding that no reasonable jury could find that Dal-Tile constructively discharged Freeman.

1

3.   Whether the district court erred in holding that no reasonable jury could find that Dal-Tile obstructed justice under North Carolina common law by destroying electronic evidence concerning Freeman's claims.

## STATEMENT OF THE CASE

This appeal arises from an action by appellant Lori Freeman alleging that Dal-Tile, her former employer (1) maintained a hostile work environment consisting of race- and sex-based harassment perpetrated by Timothy Koester, an independent contractor who frequently visited her workplace, in violation of Title VII and 42 U.S.C. § 1981; (2) constructively discharged her in violation of 42 U.S.C. § 1981; and (3) obstructed justice under North Carolina common law. JA 17-30.

## I.    Administrative exhaustion

Freeman filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on October 29, 2009. JA 560. EEOC issued a Notice of Right to Sue (Notice) dated July 28, 2010, JA 582, which Freeman did not receive until August 25. JA 575. Prior to the Notice's issuance, Freeman repeatedly contacted EEOC to check the status of her charge. JA 574, 578-79. In July 2010, Freeman spoke to an EEOC investigator, who said EEOC would send her the Notice within 30 days of closing her case. JA 574, 578. In August 2010, having not yet received the Notice, she called EEOC and was told the agency had

2

issued the Notice on July 28. JA 574. However, EEOC's case log for Freeman's case does not reflect that the Notice was issued or mailed on that date. JA 579.

On August 20, 2010, Freeman's trial counsel contacted EEOC to request that the Notice be reissued. JA 580. The case log indicates that EEOC mailed the Notice to Freeman's trial counsel on August 23, but it was postmarked August 24. JA 579, 581. Freeman received the Notice on August 25. JA 575.

## II.     Complaint

On November 20, 2010, eighty-seven days after she received the Notice, Freeman filed a complaint under Title VII and 42 U.S.C. §1981 against Mohawk (doing business as Dal-Tile Corporation, Dal-Tile Distribution, Inc., and Dal-Tile Services, Inc.), VoStone, and Timothy Koester, an independent contractor. JA 2.

Freeman voluntarily dismissed VoStone on April 20, 2011, JA 11, and Koester on June 7, 2011. JA 14. On April 3, 2012, Freeman stipulated to the replacement of Mohawk, the only remaining defendant, with Dal-Tile, a wholly-owned subsidiary of Mohawk. JA 6, 425. Freeman filed her First Amended Complaint on April 4, 2012 to include an obstruction-of-justice claim under North Carolina common law in response to Dal-Tile's destruction of relevant electronic evidence. JA 17-30.

**III.    Decision below**

On March 14, 2013, in a lengthy opinion, the district court granted summary judgment to Dal-Tile. JA 584-641. The district court first held that Freeman timely filed her Title VII claims and rebuffed Dal-Tile's argument that it lacked successor liability for events occurring prior to its acquisition of the office where Freeman worked. JA 600-01, 620 n.26.

The district court then rejected Freeman's hostile-work-environment claims. It reasoned that although the evidence showed that "[Koester's] harassment unreasonably interfered with plaintiff's work and that plaintiff experienced psychological harm as a result," the record "would not permit a reasonable jury to find from an objective viewpoint that plaintiff's environment was hostile." JA 603-04. The court also held that even if Freeman established that Koester, a non-Dal-Tile employee who did business on Dal-Tile's premises nearly every day, created a hostile work environment through his racial and sexual harassment of Freeman, Dal-Tile could not be found liable for his actions. JA 620.

The district court also dispensed with Freeman's constructive-discharge claim, finding that it lacked support, despite evidence that she had "resigned because the depression and anxiety became too much for her." JA 622-24. Finally, the court rejected Freeman's North Carolina obstruction-of-justice claim, saying that it was "impossible to identify whether [Freeman] was actually harmed" by the

4

destruction of evidence, JA 640, while acknowledging that Dal-Tile "destroyed a significant number of emails pursuant to its email retention policy" because it did not issue a litigation hold until August 2010, eight months after Freeman filed her EEOC charge, and then prematurely removed the hold in part in October 2010. JA 560, 571, 638.

## STATEMENT OF FACTS

### I.   Introduction

Throughout her tenure at Dal-Tile Lori Freeman was subjected to severe and pervasive sexual and racial harassment by Timothy Koester, a sales representative who visited her office several times a week. Freeman's manager, her coworkers, and Koester himself acknowledged that he regularly made racial jokes or remarks, shared pornography in the workplace, and "always made comments about women," including frequently calling women "bitches" and bragging about his sexual escapades. *See, e.g.*, JA 267-69, 274, 381, 386, 534 (Wrenn Dep. 14:18-16:5, 21:11-25; Scott Dep. 10:15-20, 17:9-12; Koester Decl. ¶¶ 4-5, 7). At its worst, Koester's outrageous behavior included egregious epithets aimed at Freeman—he told her he was "as fucked up as a nigger's checkbook" after bingeing on drugs and alcohol and called her a "black bitch." JA 99, 111 (Freeman Dep. 139:14-15; 153:2-3).

5

Freeman reported Koester's harassment on several occasions to her manager, Sara Wrenn (who also often observed his conduct), but for years her employer did nothing to curb his abuse. When Dal-Tile finally addressed the harassment, its response was perfunctory and failed to prevent contact between Freeman and Koester. In the end, Koester's continual outrageous conduct, and Dal-Tile's failure to address it, severely impaired Freeman's health and forced her to leave her position.

## II.    Employment background

Freeman, an African-American woman, began working at Marble Point, a manufacturer and distributor of ceramics and natural stone products, in August 2006. JA 56, 425, 560. Around June 2008, Marco Izzi, Marble Point's owner, sold the company to Dal-Tile, and Marble Point became Dal-Tile's Raleigh branch. JA 89-90, 426. Several Marble Point employees stayed on with Dal-Tile, including Freeman, who became the General Office Clerk. JA 116, 426. In 2009, Freeman became a Sales Consultant. JA 116.

Freeman's direct supervisor the entire time she worked at Dal-Tile and Marble Point was Sara Wrenn.[1] JA 57, 264. Wrenn was Assistant Manager at Marble Point, and when Dal-Tile acquired that company, she became Branch

---

[1] Sara Wrenn later took the name Sara Holland. JA 263-64.

6

Manager, responsible for supervising all employees at the Raleigh branch. JA 57, 264.

Dal-Tile's customers were "fabricators," companies that purchased and installed natural stone products—for example, in home renovations. JA 67. VoStone, a fabricator and one of Dal-Tile's customers, was owned by James Vose and Izzi, from whom Dal-Tile had acquired Marble Point. JA 67, 299, 398. Timothy Koester, a white man, was an independent contractor who worked as one of VoStone's sales representatives. JA 108, 398-99. Koester frequently brought VoStone customers to Dal-Tile to select products, and Freeman interacted with him almost daily. JA 69 (Freeman Dep. 101:9-17).

## III.    Harassment and complaints

## A.    Timothy Koester's harassment and Lori Freeman's complaints

Koester's sexist and racist behavior became a problem for Freeman almost immediately after she came to Marble Point. Approximately two weeks after she began work, Koester asked, in front of Freeman, "[H]ey, who are these two black bitches[?]" referring to a photograph of two African-American women displayed in the office. JA 75 (Freeman Dep. 107:13-108:14). Wrenn, Freeman's supervisor, was present and heard the statement, but she claims Koester said, "Who are those black chicks?  I would do both of them." JA 274 (Wrenn Dep.  21:11-21).

7

Wrenn told Koester that type of language was not appreciated at the office. JA 76. Stunned, Freeman addressed Koester's comment with Wrenn that same day, asking, "Who was he and what was his deal[?] . . . Is that how he talks, is this what he does when he comes in here?" JA 76-77 (Freeman Dep. 108:20-109:11). Wrenn replied, "[H]e's an asshole, but I don't think he'll do it again." JA 77 (Freeman Dep. 109:3-11). The following day, Freeman spoke with Koester and told him that his comment was demeaning and made her feel uncomfortable. JA 75. Koester apologized and said that he would not use such language in the future. JA 75.

But Koester continued his sexist and racist conduct throughout Freeman's time at Dal-Tile. Two or three times a week, Freeman personally had to correct Koester for lewd and inappropriate behavior, telling him, "stop," "don't say that," or "I'm on the phone, people can hear you." JA 79 (Freeman Dep. 115:1-11). For example, Koester frequently discussed his sexual exploits. "He would come in to discuss what he did the night before with whatever woman he was with," Freeman explained. JA 79-80 (Freeman Dep. 115:25-116:7). In response, she "would tell him I don't want to hear it" and walk away. JA 79-80.

Soon, Koester's behavior became even more outrageous. Freeman noted that "[h]e began wanting to show me pictures in his phone of naked women he had been with." JA 80 (Freeman Dep. 116:8-19). Freeman described one occasion when Koester "had his phone open and he just kind of shoved it in my face and

8

said, '[H]ey look, this is what I left in my bed to come here today.'" JA 80

(Freeman Dep. 116:8-19). Koester described the picture that he forced on Freeman

as a "naked woman's buttocks." JA 534 (Koester Decl. ¶ 7).

Koester's reprehensible behavior often was aimed at humiliating Freeman.

For example, he publicly passed gas on Freeman's telephone receiver and, as he

handed it back to her, laughed and said it was a joke. JA 81 (Freeman Dep. 117:12-

24). Wrenn, Freeman's manager, was present and asked "what's wrong" when

Freeman started crying and walked away. JA 81-82 (Freeman Dep. 117:25-118:7).

Then, on June 3, 2009, as Freeman was preparing for a Dal-Tile open house

that evening, Koester called her and asked her to meet with customers he had

arranged to visit Dal-Tile. JA 88, 96-97 (Freeman Dep. 126:4-8; 136:24-137:6).

When Freeman explained that she was busy, Koester described how "he had been

drinking and popping pills . . . and doing eight balls [of cocaine] all night," so he

was "too fucked up right now to come [to Dal-Tile] and do it." JA 88 (Freeman

Dep. 126:13-18). Koester said he was going to send the customers over anyway

because he was "as fucked up as a nigger's checkbook." JA 99 (Freeman Dep.

139:13-15). In his declaration, Koester stated he did not recall making that exact

comment to Freeman, but he also stated that he could not deny it—and he admitted

9

at his deposition to making a "racial comment" about a checkbook. JA 343, 534 (Koester Dep. 50; Koester Decl. ¶ 8).[2]

Shocked by Koester's use of this racist slur and on the verge of tears, Freeman hung up on him. JA 99-100 (Freeman Dep. 139:16-17; 140:8-9). Unfortunately, she was the only person at the front desk and had to continue answering phone calls and helping customers, including a customer Koester had referred. JA 99-100 (Freeman Dep. 139:25-140:12). Once things slowed down, Freeman went to the warehouse and tried to regain her composure. JA 100 (Freeman Dep. 140:9-12). When Freeman came back to the front office she saw Wrenn and informed the supervisor of Koester's slur. JA 100-03 (Freeman Dep. 140:19-143:2). (Wrenn claimed that she does not remember Freeman telling her about the incident until later. JA 280-81.) Wrenn said nothing in response, merely shaking her head and continuing to pick at her toenail polish. JA 101-02 (Freeman Dep. 141:21-142:24).

After Wrenn's non-response, Freeman approached James Vose—part-owner of VoStone, where Koester worked—at the open house later that day, hoping that Vose would put an end to Koester's appalling behavior. JA 105 (Freeman Dep.

_____

[2] Koester later explained at his deposition that his "checkbook" slur was based on a racist "joke" Vose had made: when Koester asked Vose, "Do you do your checkbook or your wife?" Vose responded that he would never let his wife handle his checkbook—because she was African-American. JA 329, 343 (Koester Dep. 29:11-20, 50:4-13).

145:11-21). However, when she informed Vose that Koester had said he was "as fucked up as a nigger's checkbook," he just laughed and said "you got to admit that's kind of funny." JA 107 (Freeman Dep. 147:15-21).

A few weeks later, on July 29, 2009, Koester called Freeman about a customer. JA 109-10 (Freeman Dep. 151:18-152:17). When Freeman heard Koester say something to his six-year-old daughter, Angelina, whom Freeman had met before, she told him to tell Angelina that she said hello. JA 110 (Freeman Dep. 152:9-23). Koester then put Freeman on speakerphone. JA 110 (Freeman Dep. 152:24-25). When Angelina asked who was on the phone, Koester replied, "That's the black bitch over at Marble Point." JA 110-11 (Freeman Dep. 152:24-153:3). Floored, Freeman told Koester never to call her that name again. JA 111 (Freeman Dep. 153:4-9). Koester responded by saying "oh, word," which Freeman interpreted as mocking African-American slang. JA 111 (Freeman Dep. 153:10-13).

Koester later claimed that he called Freeman a "crazy black girl from Marble Point." JA 318, 534 (Koester Dep. 15:21-23; Koester Decl. ¶ 9). But Freeman's co-worker, Patrick Pendry, overheard the phone call and confirmed that Koester said "black bitch" (as he later told Dal-Tile's Regional Human Resources Manager). JA 214-15 (Diksa Dep. 21:15-22:5). And VoStone employee Jessica Oney testified that Koester had bragged to her that he called Freeman a "black bitch" to his six-

year-old daughter—and that he laughed as he described the incident. JA 416 (Oney Dep. 9:2-18).

Freeman immediately reported Koester's "black bitch" slur to Wrenn. JA 112 (Freeman Dep. 154:3-17). But Wrenn showed no interest in Freeman's complaint: she rolled her eyes, turned away, and continued a conversation with another employee, Jodi Scott. JA 112 (Freeman Dep. 154:8-24). Freeman was so upset by Wrenn's reaction that she started crying and had to leave the room. JA 112 (Freeman Dep. 154:13-24). She began to feel ill and was unable to come to work the next day. JA 113 (Freeman Dep. 157:3-18).

**B.    An atmosphere of omnipresent harassment**

On top of the especially severe incidents described above, Koester also regularly engaged in other racist and sexist conduct at Dal-Tile's Raleigh branch, creating a toxic atmosphere. Koester frequented the Raleigh branch "at least once a day," according to Wrenn. JA 267 (Wrenn Dep. 14:11-17). On those visits Koester "was always coming in making some sort of lewd comments," JA 78 (Freeman Dep. 110:19-20), including sexual and demeaning comments about women and racist jokes and remarks.

**1.    "Evening excursions"**

Koester often referred to women in sexual terms at Dal-Tile's Raleigh branch, particularly when bragging about what he viewed as his conquests. Asked

12

whether he made sexual statements at Dal-Tile's office, Koester responded, "I'm sure I did." JA 325. For example, he testified that "I know I have taken over the years beautiful black girls home with me, and I probably made comments like that." JA 343.

As Wrenn, the Branch Manager, acknowledged, "he liked to brag about his, you know, evening excursions, or his weekend excursions." JA 269 (Wrenn Dep. 16:1-5). She further explained, "yes, there were times where he would say something about what he did the night before that had sexual content to it." JA 268-69 (Wrenn Dep. 15:24-16:5). Wrenn provided an example: "You should have seen these hot bitches I met last night." JA 268 (Wrenn Dep. 15:2-5). Wrenn "didn't keep track" of how often Koester bragged about his supposed sexual conquests but acknowledged, "I'm sure it was more than once a month." JA 268 (Wrenn Dep. 15:2-23). As noted above, Koester forced Freeman to look at a photograph of a naked woman on his phone, *see* JA 80, and Wrenn confirmed that Koester displayed pornographic images (such as "two naked women") on his cell phone in front of "everybody." JA 271 (Wrenn Dep. 18:21-19:19).

As noted above, Wrenn also claimed to remember Koester's September 2006 comment—"Who are these two black bitches?"—as "Who are those black chicks? I would *do* both of them." JA 274 (Wrenn Dep. 21:11-21) (emphasis added). When asked whether he made similar remarks on other occasions, Wrenn

13

admitted that Koester "*always* made comments about women. I mean, he *enjoyed* women." JA 274 (Wrenn Dep. 21:22-25) (emphasis added). Scott confirmed, observing that "[i]f there was a customer that had walked by, absolutely, [Koester] would make a comment that she was hot." JA 383-84 (Scott Dep. 12:23-13:1, 13:12-17).

Koester even made sexual comments about Scott's daughters, whom he saw in a photograph at the office. JA 135-36 (Freeman Dep. 205:23-206:21). Freeman overheard him telling Scott, "I'm going to hook up with one of your daughters" or "I'm going to turn one of your daughters out." JA 136 (Freeman Dep. 206:3-21). Scott recalled that Koester said her daughters were "hot," JA 383-84 (Scott Dep. 11:17-12:4), and Koester himself referred at his deposition to a photograph "of Jodi Scott's two hot daughters." JA 351-53.

## 2. "Bitches"

Koester repeatedly used the word "bitch" at Dal-Tile's Raleigh branch. In addition to the "two black bitches" and "black bitch at Marble Point" incidents described above (at 7-8, 11-12), Freeman frequently "heard [Koester] refer to the Dal-Tile women employees as his bitches." JA 135 (Freeman Dep. 205:2-5). Patrick Suggs, a warehouse employee, testified that Koester used phrases such as "[w]orking with some crazy bitches" or "[t]hese bitches are crazy." JA 420 (Suggs Dep. 8:12-19). Scott confirmed "bitch" "was a term [Koester used] when he

14

walked into the office." JA 381-82 (Scott Dep. 10:15-20, 11:3-4). She explained that Koester made comments such as "How's my bitches?" "about every time that he came in." JA 381-82. As noted, Wrenn acknowledged that Koester also used the word "bitches" regarding sexual encounters, "referring to his night on the town the night before," for instance: "You should have seen these hot bitches I met last night." JA 267-68 (Wrenn Dep. 14:18-15:5).

### 3.    Racist jokes and comments

Koester admitted making "racially inappropriate" comments and "jokes" on his frequent visits to the Raleigh branch. JA 316, 325, 344, 534 (Koester Dep. 13:17-20, 25:18-20, 51:7-8; Koester Decl. ¶ 4-5). He acknowledged using African-American slang. JA 325 (Koester Dep. 25:18-20). And he confessed to making sexualized comments about African-American women, responding that he "probably made comments" about "tak[ing] beautiful black girls home with me" when asked what kind of racial remarks he made. JA 343 (Koester Dep. 50:14-20). He went on to brag at his deposition: "I have had sexual relations with beautiful black women." JA 344 (Koester Dep. 51:1-2).

Scott heard Koester make racial jokes or remarks "every day that he came in" "since the day [she] started" at Dal-Tile. JA 386 (Scott Dep. 17:5-19). Scott explained that Koester used slang "in a black way," using phrases such as "How's my bitches" and "Yo, bitch." JA 385 (Scott Dep. 14:4-20). When asked whether

15

Koester made "racial" jokes, Wrenn did not remember a specific example but said she "would assume" it was the type of topic he would "joke" about. JA 273-74 (Wrenn Dep. 20:19-21:6). For example, around November 2008, despite having never discussed politics with Freeman, Koester "joked" to her that "you guys won" in reference to President Obama's election. JA 534 (Koester Decl. ¶6).

## IV.    Dal-Tile's failed response

### A.    Dal-Tile's first response to Koester's harassment came three years after the harassment started.

Dal-Tile did very little to address Koester's abusive behavior, despite the company's anti-harassment policy, which prohibited conduct including "pornographic displays," "suggestive and offense conduct," and "lewd remarks." JA 439. The policy "strongly encourage[d] individuals who believe they are being harassed . . . to bring the matter to the attention of management, the associate's local Human Resources Representative, or the Employee Relations Hotline." JA 439. (There is no evidence in the record indicating that Dal-Tile's predecessor, Marble Point, maintained any anti-harassment policy.)

Wrenn, the Branch Manager, received a copy of this policy, though she received no training related to sexual or racial harassment. JA 265-66 (Wrenn Dep. 11:14-12:9). Wrenn admitted that she "didn't enjoy conflict" and didn't "like to fight" when asked to describe her conversations with Freeman about the latter's complaints. JA 279-80 (Wrenn Dep. 29:19-30:6). According to Cathy Diksa, Dal-

16

Tile's Regional Human Resources Manager, Wrenn had never reported Freeman's complaints about Koester to her. JA 217 (Diksa Dep. 24:19-21).

Dal-Tile did not initiate an investigation into Koester's harassment until August 2009, after Freeman reported Koester's "black bitch at Marble Point" slur to Diksa on July 30. JA 119-22, 430. (Freeman had already reported the incident to Wrenn right after it occurred, but the Branch Manager did nothing. JA 111-12.) Freeman explained to Diksa that Koester's repeated harassment made it impossible for her to work with him, becoming so upset that she began crying during the conversation. JA 121 (Freeman Dep. 168:13-25).[3]

Freeman recalled that Diksa told her that Dal-Tile would ban Koester from the Raleigh branch when they spoke on July 30. JA 121-22 (Freeman Dep. 168:25-169:1). Wrenn confirmed that she and Diksa discussed, at the very least, a temporary ban of Koester that same day. JA 278 (Wrenn Dep. 26:1-5). The next day (July 31), Wrenn reassured Freeman that she spoke with Koester and Vose about the issue. JA 125 (Freeman Dep. 192:1-7). Wrenn herself testified that she told Koester and Vose that Koester was not allowed to come to Dal-Tile. JA 281-82 (Wrenn Dep. 31:4-11; 32:9-15).

---

[3] Diksa's typed investigation summary indicates this conversation occurred on August 4, *see* JA 253, but her contemporaneous handwritten notes, JA 540, and Freeman's telephone records, JA 535-37, confirm that it occurred on July 30. *See also* JA 247-248.

**B.** **Dal-Tile backpedaled on banning Koester.**

Despite the supposed ban, just days later, on August 4, 2009, Freeman saw a car pull up to the Raleigh branch and realized it was Koester. JA 130. He was there to pick up a granite sample, which someone at the Raleigh branch evidently left in front of the building for him the prior evening. JA 130, 549-50. That same morning, Koester had called Dal-Tile's front desk but Freeman did not answer the phone. JA 130. Although she did not speak to Koester, they made eye contact, and encountering him only days after the "black bitch" incident caused Freeman significant emotional distress. JA 131, 150. The next day, August 5, Freeman emailed Diksa and Wrenn explaining that "seeing Tim yesterday sent me into a state of panic and anxiety." JA 549-50. She requested that Dal-Tile explain in writing the scope of Koester's ban. JA 549-50.

On August 11, Diksa came to the Raleigh branch and met with Freeman. JA 212. Freeman described Koester's history of offensive conduct, including the "nigger's checkbook" comment. JA 132-33. Diksa told Freeman, with Wrenn present, that Dal-Tile would suspend Koester for six months. JA 139-40 (Freeman Dep. 211:14-212:4). However, Diksa claimed that Dal-Tile could not prevent Koester from coming to the front of the Raleigh branch or the parking lot—as he did on August 4—because allegedly they were public property. JA 139. But this explanation, even if accurate, failed to address the fact that, as Freeman explained

18

in her August 5 email to Diksa and Wrenn, "[s]omeone [at Dal-Tile] had to tell Koester that it was ok for him to come [by] and pick up [the] sample." JA 549-50.

Later that day, Diksa met with Wrenn, who told Diksa that Koester regularly engaged in inappropriate conduct, including racial language and discussions of "his sexual preferences." JA 215-17 (Diksa Dep. 22:9-24:15). After speaking to Freeman and Wrenn, Diksa understood that Freeman had previously talked to Wrenn about Koester's behavior, and that his harassment was "not something that was new." JA 215 (Diksa Dep. 22:19-24). Diksa also interviewed Freeman's coworker, Patrick Pendry, who told her he overheard the "black bitch at Marble Point" comment. JA 213-15 (Diksa Dep. 20:13-22:5). Yet Diksa did not interview *anyone else*, despite Wrenn's and Freeman's account of past inappropriate behavior by Koester. JA 213, 215 (Diksa Dep. 20:13-18, 22:6-10).

After the August 11 meeting, Diksa discussed Freeman's complaint with Scott Maslowski, Dal-Tile's Regional Vice President and Wrenn's supervisor. JA 254, 358-59, 432. Diksa recommended that Dal-Tile "have [Koester] not come into the building," and Maslowski agreed to a six-month separation between Freeman and Koester. JA 220-21, 254 (Diksa Dep. 27:13-28:10). However, according to Diksa, Maslowski wanted to speak with VoStone's owner "to make sure everyone was on the same page." JA 221 (Diksa Dep. 28:13-18).

19

## C.    VoStone's intervention

On August 12, the day after Diksa's visit, Izzi, part-owner of VoStone and owner of Dal-Tile's predecessor, sent an email to Wrenn and Maslowski objecting to Dal-Tile's ban of Koester from the Raleigh branch. JA 257-58, 306-07, 363-64. The email stated that it "follow[ed] today's conversation," indicating that Izzi also spoke to Maslowski, Wrenn, or both. JA 257-58, 363. Izzi wrote that Dal-Tile had "communicated to [VoStone] that [Koester] . . . is not [sic] longer welcome to visit your premises." JA 257-58. The email suggested that Freeman's allegations were a private matter between her and Koester. JA 257-58. Izzi asked if Dal-Tile still wanted to do business with VoStone and wrote "we need to know officially what is your final position on this issue." JA 257-58. He emphasized that, if VoStone could not "utilize [Koester's] services 100%, we would have to let him go." JA 257-58. But Koester was not even an employee of VoStone—he was an independent contractor. JA 302. And VoStone had other sales representatives (including Vose) who could have escorted customers to Dal-Tile. JA 365-66.[4]

_____

[4] Moreover, VoStone's owners knew that another Raleigh granite company, World Granite, had banned Koester in 2006 after he made "many sexually inappropriate and lewd comments" to a sales representative. JA 304, 399, 573. World Granite had attempted to address Koester's behavior by limiting his access to certain personnel, but this proved ineffective, so World Granite barred Koester from contacting the company. JA 573. At his deposition, Izzi suggested that World Granite's ban of Koester was "talked about" at Marble Point. JA 304 (Izzi Dep. 18:1-13).

Freeman knew nothing of these discussions between VoStone and Dal-Tile and believed Dal-Tile had suspended Koester for six months. Around August 17, Freeman was "caught [] offguard" when she learned she would be meeting with Maslowski and Izzi that day to discuss Koester. JA 143-44 (Freeman Dep. 217:12-218:21). In the meeting, Izzi urged Freeman to agree to end the suspension if Koester apologized. JA 145. Freeman said no, describing Koester's conduct—including the "checkbook" comment—in detail and explaining that she found it extremely demeaning. JA 145-46. She was very upset and began crying and shaking. JA 145-46, 307. In the meeting, Maslowski put the onus on Freeman to think of possible solutions that would facilitate Koester's access to the Raleigh branch. JA 147-48, 368.

## D.    Ostracism by Wrenn and further contact from Koester

Shortly after Freeman complained to Diksa, Wrenn began ostracizing Freeman and treating her more harshly. JA 142-43, 182-84. After the August 11 meeting with Diksa, Wrenn did not speak to Freeman for the rest of the day and avoided making eye contact. JA 140. Wrenn and Scott began excluding Freeman from smoking breaks, which they previously shared. JA 142-43. Freeman believed that they were avoiding her; they "made sure that [she] got the cold shoulder" and made her "not feel[] a part of the team anymore." JA 143, 182-83 (Freeman Dep.

21

21:1-47, 293:23-294:2). Although Freeman confronted Wrenn about this exclusion, it continued until Freeman left Dal-Tile. JA 143, 182-83.

To make matters worse, around August 21, Koester called the Raleigh branch and Freeman answered the phone. JA 150-52. He asked her a question about a VoStone customer and Freeman briefly responded and hung up the phone. JA 150-51. Then, on August 28, Koester contacted Freeman by email about the same customer. JA 203.

**E. Dal-Tile officially allowed Koester to return, exacerbating Freeman's emotional distress.**

Around August 31, Freeman again saw Koester on Dal-Tile premises with a customer, causing her to become extremely upset. JA 158. Without telling Freeman, Wrenn had told Koester he could bring a customer to Dal-Tile while Freeman went out for lunch. JA 157-58. But when Freeman told Wrenn she did not plan to go out for lunch that day, Wrenn did not tell Koester to stay away. JA 158. Quite the contrary, Wrenn suggested that Freeman could assist Koester with the customer, but Freeman said she would not work with him. JA 157-58. Freeman saw Koester when he arrived and began crying and felt ill. JA 158-59. She later informed Wrenn in an email that she was unhappy with Koester's return and explained how it had affected her. JA 161-62.

Soon afterwards, Freeman contacted Diksa, who informed her that Dal-Tile had decided to allow Koester access to the Raleigh branch. JA 160. Instead of

22

banning or suspending Koester, Dal-Tile would permit him to visit the branch, but for six months he would have to arrange visits through Wrenn. JA 160, 259. Dal-Tile had sent a letter to VoStone outlining this approach on August 31 *but nobody had informed Freeman*. JA 160, 259. And, although Dal-Tile's access-through-Wrenn plan supposedly was meant to prevent contact between Freeman and Koester, JA 259, it proved ineffective immediately. Rather than protecting Freeman, Wrenn pressured her to work with Koester, failed to confirm that Freeman would be out of the building when Koester arrived, and refused to tell Koester that he could not come to the branch once Wrenn learned Freeman was not leaving the building. JA 157-58.

Maslowski and Diksa offered drastically conflicting accounts of Dal-Tile's decision to allow Koester access to the Raleigh branch. Diksa explained that Maslowski and Izzi agreed on the access-through-Wrenn approach around August 12 (the date of Izzi's email) or shortly thereafter, and that Maslowski informed her of their decision. JA 222-25 (Diksa Dep. 29:2-32:15). She noted that Maslowski and Izzi had also discussed "the amount of business Vostone has agreed to do with Daltile." JA 254. Diksa could not explain why the August 31 letter to Izzi indicated that Dal-Tile implemented the access-through-Wrenn plan "beginning August 4." JA 227, 259.

By contrast, Maslowski testified that Dal-Tile took no action regarding Koester's access before Freeman started medical leave (discussed below at 25-26), because he was waiting for *her* to provide solutions after their August 17 meeting with Izzi. JA 369-70 (Maslowski Dep. at 26:7-27:5). But Dal-Tile informed VoStone that Koester could return by August 31—*before* Freeman began her medical leave (on September 2). JA 171, 259.

After hearing that Koester would return to the Raleigh branch, Freeman became ill. JA 161. She took medical leave from September 2 until mid-November. JA 171. When she returned from leave, she learned Dal-Tile had dropped her from the Sales Consultant role, which meant she lost eligibility for an incentive program. JA 175-76. Freeman was told this change would be "easier" for her given her absence. JA 175.

## V.    Impact of the harassment

Over time, Koester's constant harassment and Dal-Tile's failure to address it took a heavy toll on Freeman, eventually causing her to leave Dal-Tile. JA 179-80. Freeman suffered from anxiety and depression, with symptoms including panic attacks, nausea, numbness in her arms and fingertips, labored breathing, and hair loss, all from Koester's abuse and Dal-Tile's ineffectual response. JA 159, 179 (Freeman Dep. 254:12-15, 281:23-25). Dal-Tile was aware of the impact on Freeman: she told Wrenn directly that the situation was making her ill and

24

affecting her work, and her distress was visible to many witnesses who saw her crying at work. JA 149, 285, 307, 386, 422 (Freeman Dep. 231:6-2; Wrenn Dep. 42:7-11; Izzi Dep. 21:14-22; Scott Dep. 17:1-4; Suggs Dep. 14:5-20).

On July 31, 2009, two days after Koester's "black bitch at Marble Point" slur, Freeman sought medical treatment for nervousness, difficulty sleeping, crying spells, and an anxiety attack. JA 187-88, 548. She was diagnosed with situational anxiety and prescribed medication. JA 548. On August 17, after meeting with Izzi and Maslowski, Freeman began crying uncontrollably at her desk and had to take medication for a panic attack. JA 148 (Freeman Dep. 224:17-25).

On August 31 or September 1, when Freeman learned that Dal-Tile would allow Koester to return to the Raleigh branch, she began crying and became ill at the office, experiencing numbness in her arms, shortness of breath, headaches, loss of appetite, and nausea. JA 158-61 (Freeman Dep. 240:21-243:11). She left the office to regain her composure and returned only after she confirmed that Koester was gone. JA 159 (Freeman Dep. 241:15-19). She contacted Dal-Tile's employee assistance program that day and told Wrenn she needed to leave the office. JA 159, 161 (Freeman Dep. 241:20-23, 243:6-8).

From September 2 to around November 17, Freeman took medical leave and received short-term disability benefits. JA 172, 173-74 (Freeman Dep. 253:2-17, 257:12-258:19). During her leave, Freeman sought counseling and psychiatric

25

care. On September 2, Freeman was prescribed medication for anxiety and depression. JA 553. The following week, Freeman reported decreased appetite, weight loss, a depressed mood, difficulty sleeping, headaches, and low energy. JA 555. In October 2009, Freeman received mental health services on several occasions. JA 173, 561.

When Freeman returned to work she feared Koester would return to the Raleigh branch because Dal-Tile had not banned him. JA 180 (Freeman Dep. 282:2-3). Freeman eventually was told that Koester no longer worked for VoStone but was currently with another company in the same industry. JA 176 (Freeman Dep. 273:9-17). Wrenn acknowledged to Freeman that Koester still was allowed to come to the Raleigh branch, though she claimed it was less frequent, and another employee confirmed that Koester had recently visited the branch. JA 176, 274. Therefore, although Koester worked for a different company, Freeman still worried that he might come to her office. JA 180 (Freeman Dep. 282:2-3). Freeman continued to experience depression and anxiety and she was forced to leave Dal-Tile on December 7, 2009. JA 179-80 (Freeman Dep. 281:17-282:3).

## VI.    Dal-Tile's destruction of evidence

Dal-Tile's parent company, Mohawk, maintained an email retention policy applicable to Dal-Tile providing for automatic deletion of emails more than six months old. JA 565. This policy contained an exception for "messages relevant to

26

any threatened or pending litigation or legal proceeding," which "must be preserved." JA 566. Under this policy, employees were required to notify the General Counsel "immediately of any threatened litigation so that we can ensure relevant messages are preserved." JA 566.

Dal-Tile knew of a risk of litigation with Freeman as early as August 2009, when the company began to investigate her harassment complaints. *See* JA 206-07. On August 11, Diksa interviewed Freeman and Wrenn, and, around that time, she discussed Freeman's complaint with her supervisor, David Roberts, at Dal-Tile's central Human Resources department. JA 212, 219, 239-40 (Diksa Dep. 19:3-13, 26:13-19, 60:12-61:2). Roberts and Richard Cuccia, Dal-Tile's Assistant General Counsel, consulted with outside counsel regarding the investigation and Dal-Tile's August 31 letter to VoStone. JA 239-40 (Diksa Dep. 59:3-60:21). Freeman filed her EEOC charge on October 28, 2009. JA 578. Dal-Tile sought the assistance of Jackson Lewis LLP, a major labor and employment firm, in responding to the charge. JA 229-30, 582.

Despite Dal-Tile's preparations for potential litigation as early as August 2009, the company initially took no action to preserve electronically stored information (ESI) relevant to Freeman's complaints, such as the email records of Wrenn, Diksa or Maslowski. Instead, Dal-Tile continued to delete all emails more than six months old and did not issue any guidance to employees about preserving

27

other ESI, although preservation was required under company policy. The only exception occurred around November 2009, when Diksa instructed Craig Belden, an Operations Manager, to review *Freeman's* email and copy relevant material. JA 403 (Belden Dep. 11:11-22). However, Belden's review was cursory, only encompassing emails with subjects or senders he deemed pertinent based on his limited knowledge of Freeman's complaints. JA 401-404 (Belden Dep. 9:5-10:2, 11:25-12:24)

A year after the investigation began, on August 2, 2010, Dal-Tile finally issued a litigation hold directing Diksa, Belden, and Wrenn (but not Maslowski) to preserve all emails and other ESI related to Freeman. JA 565, 571. However, because Wrenn was terminated in December 2009, Dal-Tile had already destroyed all of her emails by January 2010, rendering the litigation hold useless as to her ESI. JA 288, 518, 565, 571. Similarly, a later search for Diksa's and Maslowski's emails found "*no data* from June 2008 to December 2009," JA 571, the time period that covered the "nigger's checkbook" and "black bitch" slurs and Freeman's departure from Dal-Tile. Dal-Tile then removed the litigation hold on Diksa in October 2010 and did not reinstate it until August 2011. JA 2, 571.

Because of Dal-Tile's failure even to begin to retain ESI until August 2010, the company deleted all relevant emails from the period encompassing Freeman's complaints and Dal-Tile's investigation, except for hard copies of a few emails

28

saved in Diksa's original investigation file and those Belden copied. JA 518, 522, 571. The deleted emails likely contained material relevant to Freeman's case. For example, Wrenn testified that throughout Dal-Tile's investigation she emailed "important" information to Diksa about Freeman, including updates about "the atmosphere at work" and her conversations with Freeman. JA 279 (Wrenn Dep. 29:2-14).

## SUMMARY OF THE ARGUMENT

A reasonable jury easily could conclude that Freeman was subjected to sex- and race-based harassment sufficiently severe or pervasive to alter the terms and conditions of her employment and thus violate Title VII and section 1981. Koester subjected Freeman to several incidents of especially severe race- and sex-based harassment, including use of the epithet "nigger." Additionally, Koester's harassment permeated Freeman's workplace because he engaged in sexually and racially offensive conduct almost every time he visited the Raleigh branch—at least several times each week. Others at Dal-Tile, including Freeman's supervisor, tolerated Koester's outrageous behavior and refused to remedy it. Based on the record, a reasonable jury could determine that Freeman's work environment was objectively hostile.

A jury also readily could find that Dal-Tile is liable for the hostile work environment. Dal-Tile had actual knowledge of Koester's harassment because

29

Freeman informed her supervisor about several of the incidents as they occurred, and her supervisor also witnessed his frequent sexist and racist behavior first-hand. And, Dal-Tile had constructive knowledge given that Koester's abusive behavior was widely recognized. A jury reasonably could determine that Dal-Tile took no remedial action for years, despite knowing of the harassment. When Dal-Tile finally acted, and the company misled Freeman about the steps it planned to take to stop the harassment, and its approach proved unsuccessful at preventing contact between Koester and Freeman.

For similar reasons, Dal-Tile's response, when it came, was so indifferent and ineffective that it caused Freeman's constructive discharge. A reasonable jury could conclude that Dal-Tile, more concerned about profit than compliance with anti-discrimination law, deliberately created an intolerable work environment that forced Freeman to leave.

A jury could also readily find that Dal-Tile obstructed justice under North Carolina law by destroying emails relevant to this foreseeable litigation. Relatedly, the district court also overlooked the inference of spoliation justified by Dal-Tile's destruction of evidence, which should have further weighed against summary judgment on Freeman's federal claims.

## ARGUMENT

### I.    Standard of review

This court "review[s] the district court's grant of summary judgment de novo, applying the same legal standards as the district court and viewing the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). A grant of summary judgment should be reversed "if the evidence is such that a reasonable jury *could* return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added).

### II.    Hostile work environment

A reasonable jury easily could find (1) that Koester's harassment of Freeman was unwelcome, based on her sex and race, and sufficiently severe or pervasive to alter the conditions of her employment and create a hostile work environment, and (2) that Koester's harassment is imputable to Dal-Tile. *See Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).[5]

### A.    A reasonable jury could conclude that Freeman was subjected to a racially and sexually hostile work environment.

Hostile-work-environment claims arise "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

---

[5] Freeman's section 1981 claims are analyzed under the same standards applicable to Title VII claims. *See, e.g.*, *Spriggs*, 242 F.3d at 184.

working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). An employee must show that she experienced harassment that was both subjectively and objectively hostile or abusive. *Id.* at 21-22. The objective inquiry is "judged from the perspective of a reasonable person in the plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

In assessing a hostile-work-environment claim, courts must consider "all the circumstances," including, but not limited to, the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating, whether it interfered with the plaintiff's work performance, and whether psychological harm resulted. *Harris*, 510 U.S. at 23. Therefore, "the question of whether harassment was sufficiently severe or pervasive is quintessentially a question of fact." *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (internal quotation marks and citation omitted).

1.    **The district court erred in failing to consider the cumulative effect of combined racial and sexual harassment.**

Koester's harassment was based on race (e.g., "nigger's checkbook," "black bitch," racial jokes and comments) and sex (e.g., pervasive use of sexist language, displaying pornography, and bragging about sexual escapades). *See EEOC v. Cent. Wholesalers*, 573 F.3d 167, 175 (4th Cir. 2009) (characterizing similar harassment as based on race and sex). Much of Koester's conduct was simultaneously racist

and sexist, for example, where he applied racial modifiers to sexually demeaning language ("*black* bitch") or imitated stereotypical African-American slang ("Yo bitch" and "How's my bitches"), infecting his sexual harassment with racist overtones and vice versa.

But the district court failed to "recognize that a hostile work environment claim can be bolstered by relying on evidence of a workplace tainted by both sex and racial discrimination." *Mosby-Grant,* 630 F.3d at 336. Instead, the district court acted as a fact-finder in assessing the racial implications of Koester's clearly sexist language. For example, although Freeman's coworker viewed Koester's use of "slang" like "Yo, bitch" and "How's my bitches" as having a "racial" character because Koester was speaking "in a black way," JA 385, 395, the district court explained that it "[did] not believe that these phrases are racial on their face." JA 606. The district court opined that "Yo, bitch" and "How's my bitches?" were not related to Freeman's race because Koester also used those phrases with white women who (the district court simply presumed) were not offended by Koester's language. *See* JA 606, 618 n.25. Similarly, the district court resorted to a dictionary definition to conclude that Freeman's references to "lewd" comments could not have any racial dimension. JA 605.

Contrary to the district court's assessment of the facts, a reasonable jury could conclude that Koester's race- and sex-based harassment so closely

33

overlapped that they should be assessed together. A jury could also reasonably find that Freeman suffered from a uniquely abusive environment as the only black woman in the office, evaluating the harassment, as it must (and as the district court should have) from the viewpoint of a reasonable person *in Freeman's position*. *Oncale*, 523 U.S. at 81.

### 2. A reasonable jury could find that Freeman was subjected to severe or pervasive harassment because of her sex and race.

Koester's harassment of Freeman was severe, pervasive, and humiliating. *See Harris*, 510 U.S. at 23. It caused psychological harm serious enough that Freeman sought mental health treatment, took short-term medical leave, and eventually left Dal-Tile. *See id.; see also supra* at 24-26.  As even the district court recognized, *see* JA 603-04, the harassment "unreasonably interfere[d] with [Freeman's] work performance," *Harris*, 510 U.S. at 23, causing her to burst into tears and suffer anxiety while at the office. *See supra* at 21-22, 24-25. Freeman found the harassment unwelcome and subjectively offensive, as established by her complaints to management and her emotional distress, *see Cent. Wholesalers*, 573 F.3d at 175-76, and a reasonable jury could also find Koester's conduct objectively offensive.

#### a. Koester's harassment of Freeman was severe and humiliating.

Koester targeted Freeman with some of his most extreme and most sexist and racially charged harassment. Freeman was devastated when Koester told her,

"I'm as fucked up as a nigger's checkbook." JA 99. As this Court has recognized, "[f]ar more than a 'mere offensive utterance,' the word "nigger" is pure anathema to African-Americans." *Spriggs*, 242 F.3d at 185. "Nigger" is so uniquely offensive, this Court continued, that it has a singular capacity to create a hostile work environment. *Id.*[6]

An African-American woman in Freeman's position would also reasonably view Koester's "black bitch" comment as "anathema." *See* JA 111. "Bitch"— which Koester often used—is clearly sexist, *see, e.g.*, *Mosby-Grant*, 630 F.3d at 335; *Cent. Wholesalers*, 573 F.3d at 170, but Koester's use of the racial modifier made the epithet especially outrageous. Indeed, "the addition of the word 'black' to otherwise race-neutral insults is an indicator that the individual is being targeted because of his race." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 776 (D. Md. 2010) (collecting cases).

A reasonable jury could find that Koester's slurs were designed to "humiliate[e]" Freeman. *Harris*, 510 U.S. at 23. When Koester called Ms. Freeman a "black bitch," he did so in front of his young daughter. And the "nigger's

---

[6] Other circuits have, in employment-discrimination cases, similarly recognized the exceptionally racist nature of the word "nigger." *See, e.g.*, *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013); *id.* at 579-80 (Kavanaugh, J., concurring) (collecting single-incident verbal-harassment cases); *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 210-11 (2d Cir. 2010); *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 356 (8th Cir. 1997); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993).

checkbook" comment evoked highly negative and demeaning stereotypes about African-Americans' intelligence and abilities. Koester subjected Freeman to other humiliating treatment as well. For example, he forced her to look at a pornographic photograph on his cell phone while bragging about having had sex with the woman in the picture. JA 80, 534. On another occasion, Koester intentionally passed gas on Freeman's desk telephone (even though Wrenn, the supervisor, was present). JA 81.

To an African-American woman Freeman's position, Koester's outrageous and humiliating racist and sexist behavior would seem particularly severe. Even a few severe incidents can violate Title VII when they occur in an environment already suffused with racial and sexual bias, as was the case here. *See Jennings v. Univ. of N. C.*, 482 F.3d 686, 698 (4th Cir. 2007) ("A jury could reasonably find that . . . two incidents . . . of direct harassment . . . were more abusive in light of the general, sexually charged environment. In other words, the incidents were not isolated events, but were part of an abusive pattern that instilled fear and dread.").

    b.    *Koester's harassment was pervasive.*

The record reflects a pattern of persistent harassment by Koester. As Freeman put it, Koester "was always coming in making some sort of lewd comments." JA 78. Her coworker Scott explained that Koester made racial jokes or remarks "every day" "since the day [she] started" working at Dal-Tile. JA 386.

36

Koester himself acknowledged making "racial comments" and "racial jokes" at the Raleigh branch. JA 534. And Wrenn, the Branch Manager, confirmed that Koester "always made comments about women," often used the word "bitches," and "liked to brag about" his sexual escapades. JA 267, 269 274. *See EEOC v. Sunbelt Rentals*, 521 F.3d 306, 318 (4th Cir. 2008) (emphasizing the "cumulative effect" of "habitual epithets" in concluding that a jury could find the environment objectively abusive). Koester was enabled by others' tolerance for his conduct, including Vose—who laughed and said "you've got to admit that's kind of funny" when Freeman told him of the "nigger's checkbook" comment—and Wrenn, who responded to Freeman's genuine complaints with disinterest. JA 102, 107.

But the district court dismissed the ample evidence that Koester engaged in pervasive harassment. Illustrative is the district court's implausible interpretation of Wrenn's testimony about Koester: "He always made comments about women. I mean, he enjoyed women." JA 274. Despite abundant evidence of Koester's sexism, the court found Wrenn's statement ambiguous, suggesting that "Wrenn's testimony could be construed to mean that Koester made comments about a particular woman being funny, intelligent, or kind." JA 616 n.21. Rather than let the jury resolve this supposed ambiguity (a central role of the jury), the court discounted the testimony, although it appears clear in context: Wrenn was

37

explaining Koester's statement that he would "do" "those black chicks." JA 274, 616 n.21.

The district court also dismissed coworkers' testimony describing the frequency of Koester's offensive behavior as "too vague," JA 617, explaining that the court could not determine how much of Koester's abusive conduct was directed at Freeman. JA 617. But precisely *because* Koester made racial comments "every day" and was "always" talking about women, *see* JA 274, 386, it is hardly surprising that Dal-Tile employees, in an environment suffused with racial and sexual hostility, specifically recall only some of the most offensive incidents. Moreover, because the entire "'environment' of workplace hostility" is relevant to Freeman's claims, *Spriggs*, 242 F.3d at 184 (citing *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n. 2 (11th Cir. 1982)), "[t]he fact that many of the epithets were not directed at [Freeman] is not determinative" given that "offensive language often was used in [her] presence." *Walker*, 684 F.2d at 1359 n.2.

  c.  *The district court failed to consider the cumulative effect of Koester's harassment.*

The district court erroneously "discuss[ed] [the] incidents [of harassment] separately," justifying its approach by reasoning "that the individual occurrences were not 'extremely serious.'" JA 607-08 n.17 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). But Freeman was not required to show that each incident was sufficiently severe to give rise to a hostile work environment

38

independently—although the "checkbook" comment was extremely serious on its own. "[Hostile-work-environment] claims are based on the cumulative effect of individual acts," and the law allows employees to establish such claims by showing that "all of the circumstances" "collectively" meet the severe or pervasive standard. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-117 (2002). The record reflects more than sufficient evidence establishing that Koester's harassment followed common themes of sexual bragging, wanton use of racist language, and injection of race into sexist comments.

**B.    A reasonable jury could find that liability for Koester's harassment is imputable to Dal-Tile.**

Dal-Tile is liable for Ms. Freeman's hostile-work-environment claims under a negligence standard: that  it "[knew] or should have known of the conduct and fail[ed] to take immediate and appropriate corrective action." *EEOC v. Cromer Food Servs., Inc.*, 414 F. App'x 602, 606 (4th Cir. 2011) (quoting 29 C.F.R. § 1604.11(e)). Although this Court has not adopted a standard for evaluating employer liability for harassment by a non-employee in a published decision, it has, in an unpublished decision, applied the same negligence standard used in coworker harassment cases. *Id*. Four other courts of appeals, as well as the EEOC, have also adopted the negligence standard for non-employee harassment. *Id.* at 606-07 (collecting cases). Dal-Tile and the district court both accepted the negligence standard. JA 620; Def.'s Mem. Supp. Mot. Summ. J. (R. 61) at 18.

39

1.    **Dal-Tile had actual or constructive knowledge of Koester's harassment of Freeman.**

a.    *Actual knowledge*

Dal-Tile had actual knowledge of the harassment through Wrenn, who supervised Freeman and all other employees at Dal-Tile's Raleigh branch. *See* JA 57, 264-65. An employee may establish her employer's actual knowledge of harassment through evidence that she reported harassment to management, *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998) (citing *Swentek v. USAIR*, 830 F.2d 552, 558 (4th Cir. 1987)), or through other proof that management knew of the harassment. *Watson v. Blue Circle, Inc.*, 324 F.3d 1252 (11th Cir. 2003). Freeman repeatedly complained to Wrenn about Koester's sexist and racist conduct, and Wrenn personally witnessed that conduct, establishing Dal-Tile's actual knowledge.

Wrenn was present in September 2006 when Koester asked, "[W]ho are these two black bitches?" in front of Freeman. JA 76. (Wrenn claims he said something equally, if not more, offensive: "Who are those black chicks? I would do both of them." JA 274.) When Freeman told Wrenn she was uncomfortable with Koester's vulgar language that same day, Wrenn indicated that the comment was typical for him. JA 76-77. Freeman immediately notified Wrenn of Koester's "fucked up as a nigger's checkbook" comment (although Wrenn disputes this), and she also informed Vose, VoStone's part-owner. JA 101-102, 107. When Koester

40

called Freeman "the black bitch over at Marble Point," she reported the slur to Wrenn immediately and to Diksa, the Regional Human Resources Manager, the next day. JA 111-12, 119-21. Freeman's multiple complaints to managers are enough to establish Dal-Tile's actual notice. *See Sunbelt Rentals*, 521 F.3d at 320; *Harris v. L&L Wings*, Inc., 132 F.3d 978, 982 (4th Cir. 1997). At a minimum, Wrenn's differing recollections of Koester's "two black bitches" comment and when she learned of the checkbook slur create genuine disputes for the jury.

Freeman followed Dal-Tile's anti-harassment policy in reporting the harassment to Wrenn and then to Diksa. Dal-Tile's policy "strongly encourage[d]" victims of harassment "to immediately bring the matter to the attention of *management*" or Human Resources, JA 439 (emphasis added), and therefore both Wrenn and Diksa were "specifically designated . . . appropriate person[s] to receive [] complaints." *EEOC v. Xerxes Corp.*, 639 F.3d 658, 671 (4th Cir. 2011). When an employer establishes a policy for reporting harassment and "an employee follows that policy, the employer's notice of the harassment is established by the terms of the policy." *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000); *accord Williamson v. City of Houston*, 148 F.3d 462, 467 (5th Cir. 1998).

The district court wrongly determined that "no reasonable fact-finder could conclude" that Freeman put Dal-Tile on notice when she spoke to Wrenn about the 2006 "black bitch" comment or complained of the "nigger's checkbook" comment.

JA 622-23. The district court faulted the former as not "sufficiently specific to constitute a complaint" and the latter because Freeman supposedly failed to tell Wrenn "how [the slur] made her feel." JA 622. But in both cases, Freeman "[brought] the matter to the attention of management," as provided in Dal-Tile's harassment policy. JA 439. A jury reasonably could find that Freeman adequately expressed to Wrenn that the 2006 "black bitch" comment made her uncomfortable. And even assuming (incorrectly) that Freeman did not directly express her outrage at the "nigger's checkbook" slur, the phrase is so vile that a manager should perceive its offensiveness to an African-American employee.

Dal-Tile also had actual knowledge because, in addition to receiving Freeman's multiple reports of harassment, Wrenn personally witnessed Koester's outrageous behavior on many other occasions. Wrenn saw Koester show "everybody" pornography on his phone several times and acknowledged that Koester "always made comments about women," often used the term "bitch," and frequently made other sexual comments in the office. JA 267, 269, 272, 274. That conduct violated Dal-Tile's anti-harassment policy, which specifically prohibited "pornographic displays," "suggestive or offensive comments", and "lewd remarks." JA 439.

42

*b.    Constructive knowledge*

A reasonable jury also easily could find that Dal-Tile management *should have known* of the hostile atmosphere that Koester created. "[K]nowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003) (internal quotation marks and alteration omitted). Further, the "repeated nature of the harassment" alone "constitutes evidence that management knew or should have known of its existence." 1 B. Lindemann & P. Grossman, *Employment Discrimination Law* 348–349 (3d ed. 1996) (quoted in *Morgan*, 536 U.S. at 115); *see also Katz v. Dole*, 709 F.2d 251, 255 (4th Cir. 1983) (constructive notice exists when "harassment was so pervasive that employer awareness may be inferred").

Koester's appalling conduct was widely known at Dal-Tile. Wrenn personally witnessed it. Scott heard Koester make racial jokes or remarks "every day" and testified that he used phrases such as "How's my bitches?" "about every time that he came in." JA 381-82, 386. At Marble Point, it was "talked about" that another local granite company had banned Koester for making "sexually inappropriate and lewd comments." JA 304, 573.

As Branch Manager, Wrenn was responsible for receiving and responding to harassment complaints, but she was decidedly unenthusiastic about that duty.

43

Wrenn admitted that she "didn't enjoy conflict." JA 279-80, 439. And although she knew of Dal-Tile's harassment policy, astonishingly, she received no training on the topic. JA 265-66. "An employer cannot avoid Title VII liability for [] harassment by adopting a 'see no evil, hear no evil' strategy," *Ocheltree*, 335 F.3d at 334, but that is exactly what Wrenn did. Dal-Tile cannot "avoid liability" based on its Branch Manager's disinclination to address Koester's conduct.

## 2.    Dal-Tile did not take immediate and appropriate action to end the harassment.

A reasonable jury could find that, despite Dal-Tile's policy prohibiting harassment, JA 439, the company failed to take steps reasonably calculated to end Koester's conduct. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 335 (4th Cir. 2011); *Xerxes*, 639 F.3d at 669. Dal-Tile negligently failed to "enforce its own anti-harassment policy" promptly or effectively, *Hoyle*, 650 F.3d at 335, should have prohibited Koester from entering or contacting Dal-Tile's Raleigh branch, and should have taken additional steps when Koester's continued access to Dal-Tile understandably caused Freeman emotional distress.

### a.    *Dal-Tile's response to the harassment was neither prompt nor adequate.*

A fact-finder could conclude that Dal-Tile's investigation—which did not begin until August 2009, three years after Freeman first discussed Koester's conduct with her manager—was unreasonably delayed. *See Xerxes*, 639 F.3d at

669 (promptness of an employer's investigation is relevant to assessing whether its response was reasonable). Dal-Tile did little to address, for example, Koester's "Who are these two black bitches?" comment in September 2006, his displays of pornographic photographs, or his passing gas on Freeman's phone. JA 76, 272. Even worse, Dal-Tile did not respond to Koester's "fucked up as a nigger's checkbook" slur. JA 101-02. Dal-Tile waited nearly two weeks after Koester's "black bitch over at Marble Point" epithet (on July 29) before beginning its cursory investigation (on August 11), although Koester visited the Raleigh branch in the meantime. JA 111, 627. *Cf. Cent. Wholesalers*, 573 F.3d at 177-78 (employer's week-and-a-half delay in investigating pornography, despite a policy requiring prompt investigation, supported sending liability issue to jury).

Moreover, a jury could conclude that Dal-Tile's eventual investigation was woefully inadequate because it focused on the "black bitch" epithet alone and failed to consider Koester's long history of abuse. Diksa learned of Koester's pattern of outrageous conduct from Freeman and Wrenn, *see* JA 121, 215-17, and she could have investigated past incidents of harassment, including the "nigger's checkbook" episode. However, she did not speak to *any* witnesses—including Koester himself—other than Pendry, who had overheard the "black bitch" comment. JA 213, 215.

45

b.  *Dal-Tile should have prohibited Koester from entering or contacting the Raleigh branch.*

Dal-Tile had a responsibility to maintain a workplace free of sexual and racial harassment. Because Koester was a visitor, not an employee, the company's most appropriate and simplest response would have been to prohibit him from entering or contacting the Raleigh branch, either permanently or at least for a long period—as another local granite company did. *See supra* at 20 n.4. An employer's response may be insufficient if it failed to take steps that a fact-finder "might consider reasonably calculated to end the harassment," *Sunbelt Rentals,* 521 F.3d at 320, even if the employer took some remedial action. *Cent. Wholesalers*, 573 F.3d at 177-78.

A jury could conclude that Dal-Tile, in allowing Koester access to the Raleigh branch, unreasonably failed to take additional steps to prevent harassment. Freeman realistically believed that harassment could occur anytime Koester was present because his offensive behavior was ubiquitous—he made "racial" comments and used the term "bitches" "every day," and he "always made comments about women." JA 274, 382, 386. As Freeman explained to Wrenn, just knowing Koester could call or appear at any time was enough to trigger emotional distress, *see* JA 149, 422, and her reaction was quite reasonable under the circumstances.

A jury also could find Dal-Tile's failure to ban Koester unreasonable because it put VoStone, Koester, and its own profits before Freeman's interests. Instead of taking the simplest step—banning Koester—Dal-Tile went out of its way to avoid disturbing the "amount of business" between Dal-Tile and VoStone. *See* JA 254. The parties dispute whether Dal-Tile initially banned Koester from the premises. But it is evident that after VoStone insinuated that banning Koester meant "Dal-Tile does not want to do business with Vostone any longer," Dal-Tile ensured Koester's continued access. JA 257.

    c.    *Dal-Tile's response was ineffective in preventing contact between Freeman and Koester.*

An employer may be held responsible for a hostile work environment where its response to harassment is not effective. *Xerxes*, 639 F.3d at 669. A jury could find Dal-Tile's remedial efforts ineffective because Freeman was exposed to Koester multiple times after his "black bitch" slur. Just days later, and before any investigation by Dal-Tile, she encountered Koester at the Raleigh branch because Dal-Tile had left a sample for him to pick up in front of the building. JA 130. In the next few weeks, Koester called Freeman about a customer and later emailed her. JA 150-52, 193. And Dal-Tile's ultimate solution—allowing Koester access through Wrenn—was ineffective in preventing contact with Koester: Wrenn pressured Freeman to assist Koester with a customer and allowed him to bring the customer to the Raleigh branch even though Freeman was present. JA 157-58.

47

Dal-Tile did not take any additional steps to prevent contact between Freeman and Koester, although the company knew these encounters triggered her "panic and anxiety." JA 549; *see supra* at 24-25. Freeman took leave from work—the only way she could ensure that she would not be traumatized by her harasser's presence. JA 174, 554. When Freeman returned to work and found that Koester still came to Dal-Tile, she resigned to avoid any more contact with him. JA 179-80.

## C.  Freeman is entitled to an inference of spoliation, which provides another reason to deny summary judgment.

Freeman would be entitled to a jury inference of spoliation, which, at this juncture, provides another reason to reverse the grant of summary judgment. An adverse inference may be applied when a party on notice of possible litigation destroys relevant evidence. *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155-56 (4th Cir. 1995). A party may augment its case against summary judgment by showing that that an adverse inference should be awarded at trial. *See Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998). As explained further in Part IV (at 54-58), Dal-Tile had a duty to preserve relevant emails, including emails between Diksa and Wrenn concerning Freeman's complaints. Nevertheless, Dal-Tile failed to implement a litigation hold until August 2010—a year after Dal-tile's investigation and eight months after Freeman filed her EEOC charge—resulting in the destruction of all email records of Wrenn, Diksa, and Maslowski from the relevant period. *See supra* at 26-29.

48

Dal-Tile's failure to preserve the emails amounted to willful destruction and deprived Freeman of potentially essential evidence in her suit against the company. Destruction of ESI is considered willful when the defendant knew of the documents' relevance and failed to take steps to preserve them. *Powell v. Town of Sharpsburg*, 591 F.Supp.2d 814, 820-21 (E.D.N.C. 2008) (destruction of evidence pursuant to document retention policy was willful) (citing *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008)).

Because Dal-Tile failed to take steps necessary to preserve evidence it knew was relevant to potential litigation, Freeman will be entitled to a spoliation inference at trial instructing the fact-finder to presume that the destroyed evidence was harmful to Dal-Tile. Similarly, at summary judgment it should be presumed that this adverse inference will enable the jury to find many issues of disputed facts in Freeman's favor, such as the insufficiency of Dal-Tile's remedial efforts and Dal-Tile's prior knowledge of Koester's abusive behavior.

* * * * *

In sum, a reasonable jury could conclude that Freeman suffered a hostile work environment because Koester subjected her to persistent racial and sexual harassment that became extreme on several occasions. The record also supports a conclusion that Dal-Tile is liable for Koester's harassment because it had actual

and constructive knowledge of his conduct, yet failed to take reasonable steps to

protect Freeman.

## III.    Constructive discharge

A reasonable jury could find that Freeman was constructively discharged

because Dal-Tile "deliberately [made] [her] working conditions . . .  intolerable in

an effort to induce [her] to quit." *Whitten v. Fred's, Inc.*, 601 F.3d 231, 248 (4th

Cir. 2010) (internal citation and quotation marks omitted), abrogated on other

grounds by *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013). Freeman was forced

to leave her position because, on top of the hostile work environment Dal-Tile

tolerated for years, the environment grew even more unbearable as Dal-Tile

refused to protect her from her harasser and misled her about how it planned to

resolve the situation, her supervisor and a coworker ostracized her, and Dal-Tile

took away her Sales Consultant position.

## A.    Freeman has raised a question of fact as to whether her work environment was objectively intolerable.

Freeman's work environment "present[ed] a 'worse case' harassment

scenario, harassment ratcheted up to the breaking point." *Pennsylvania State*

*Police v. Suders*, 542 U.S. 129, 147-48 (2004) (defining constructive discharge).

As detailed above (at 7-16) Freeman endured Koester's constant sex- and race-

based harassment for three years. As if Koester's offensive conduct was not

excruciating enough, Freeman faced a completely non-responsive employer for

50

most of that period. Wrenn, in particular, did nothing, although Freeman complained to her supervisor multiple times and the Branch Manager even observed Koester's outrageous behavior. "A reasonable person could certainly find intolerable a working situation" where a supervisor is "utterly unconcerned about" flagrant harassment by a visitor. *Whitten*, 601 F.3d at 249.

When Dal-Tile finally addressed Koester's harassment, its response further demonstrated a lack of concern for protecting Freeman. Although Diksa and Wrenn initially told Freeman that Koester was banned, he was back within a week, at the invitation of a Raleigh branch employee. JA 121-22, 130-31. Diksa then promised that Koester would be suspended for six months, JA 139-40, 549, but less than a week later Freeman was subjected to a meeting with Izzi, who pressured her to accept Koester's return to Dal-Tile. JA 145-47, 254. Then, without telling Freeman, Dal-Tile decided to allow Koester access to the Raleigh branch. And, Wrenn allowed Koester to bring a customer to the Raleigh branch although she knew Freeman would be in the building, and even suggested that Freeman assist Koester with the customer. JA 155-61. The record supports a conclusion that Dal-Tile was "utterly unconcerned" about protecting Freeman and far more interested in "the amount of business Vostone ha[d] agreed to do with Daltile." JA 254. And a reasonable jury could find that Dal-Tile's handling of the situation—initially

51

banning Koester and then allowing him access behind Freeman's back—made the work environment even more intolerable.

Koester's continued presence and Dal-Tile's disregard for her well-being worsened Freeman's emotional health, *see supra* at 24-26, a predictable outcome under the circumstances. Because of both the ubiquity of Koester's harassment and Dal-Tile's long-standing refusal to address it, Freeman reasonably believed that Koester would continue to harass her unless he was banned from Dal-Tile. *See supra* at 26.

On top of these intolerable conditions, Freeman's manager, Wrenn, began treating her more harshly soon after Freeman first discussed the harassment with Human Resources. Wrenn and Scott began excluding Freeman socially and gave her "the cold shoulder." JA 142-43, 182-83.  Given this treatment, which continued until she left, Freeman reasonably did "not feel[] a part of the team anymore." JA 182-83. Dal-Tile also took away Freeman's Sales Consultant position while she was on medical leave, JA 175, conceivably to make her work situation even more unbearable.

**B.    A reasonable jury could infer that Dal-Tile intended to force Freeman to resign.**

A jury may infer an employer's intent to force a resignation where the "employee's resignation was the reasonably foreseeable consequence of the employer's conduct." *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1132-33

52

(4th Cir. 1995). For instance, "intent may be inferred from a failure to act in the face of known intolerable conditions." *Id.* at 1133 (internal citation omitted). [7]

Dal-Tile did more than just fail to take steps to improve Freeman's work environment, which it knew Freeman found intolerable. After allowing the hostile work environment to persist for years, Dal-Tile actively exacerbated the problem by misleading Freeman about Koester's presence at Dal-Tile. JA 160. A reasonable jury easily could infer deliberateness from Dal-Tile's evident disregard for the undisputed physical and emotional impact Koester's presence had on Freeman.

Throughout its handling of the harassment, Dal-Tile's duplicitousness strongly suggests deliberateness. Even though Freeman's departure was a reasonably foreseeable consequence of Dal-Tile's refusal to remedy the situation, Dal-Tile put a higher value on VoStone's commercial interest in letting Koester work than on Freeman's statutorily-protected right to a workplace free from sex and race discrimination.

Moreover, the inference that Dal-Tile intended to force Freeman to resign is strengthened by Wrenn's central role in the social exclusion of Freeman when she

---

[7] The Supreme Court's decision in *Suders,* 542 U.S. 129, 147-48, should be read to abrogate this Court's requirement of deliberateness. As this Court recognized in *Whitten*, the "requirement that the plaintiff prove the employer intended to force the plaintiff to quit is arguably in some tension with the Supreme Court's decision in [*Suders*]" and that, arguably, "under *Suders*, deliberateness on the part of the employer would not be required to show . . . constructive discharge." 601 F.3d at 248 n.8. Because this panel cannot depart from the holding of *Whitten*, *id.*, we reserve the argument for possible further review.

returned from medical leave. JA 142-43, 182-84. Because Wrenn was Freeman's supervisor and the office manager, her mistreatment of Freeman supports an inference of Dal-Tile's intent to make the work environment intolerable to Freeman. Dal-Tile's retraction of Freeman's Sales Consultant position during her medical leave similarly supports an inference of intent.

* * * * *

In sum, a reasonable jury could find that Dal-Tile constructively discharged Freeman because it made her work environment objectively intolerable and because the record supports an inference that the company acted deliberately.

## IV.    Obstruction of justice

The district court erred in dismissing Freeman's North Carolina obstruction-of-justice claim because a reasonable jury could find that Dal-Tile intentionally destroyed potentially vital ESI, hindering Freeman's efforts to pursue her claims. The Supreme Court of North Carolina has recognized a civil claim for common-law obstruction of justice, which encompasses "*any act* which prevents, obstructs, impedes or hinders public or legal justice." *In re Kivett*, 309 S.E.2d 442, 462 (N.C. 1983) (quoting 67 C.J.S. *Obstructing Justice* §§ 1, 2 (1978)) (emphasis added). Common-law obstruction of justice "may take a variety of forms," *id*., including destruction of evidence potentially relevant to future litigation. *See Earp v. Quinlan*, 2010 WL 3001521 (N.C. Ct. App. Aug. 3, 2010) (deleting or altering

54

computer files when on notice of legal action); *Grant v. High Point Reg'l Health Sys.*, 645 S.E.2d 851, 855 (N.C. Ct. App. 2007) (failure to preserve and maintain medical records). Here, the destroyed emails were relevant to Freeman's lawsuit because they likely contained information about Dal-Tile's investigation into Koester's harassment and the company's response, including "important" materials such as Wrenn's updates to Diksa regarding the "atmosphere at work" and her conversations with Freeman. JA 279.

To begin with, the district court erred in finding Dal-Tile lacked the requisite intent. JA 638-39. Obstruction of justice requires general intent, not specific intent, *see* 67 C.J.S. *Obstructing Justice* § 7—that is, the intentional performance of an act that the defendant reasonably should know would hinder justice. *See State v. Wilkerson*, 247 S.E.2d 905, 917 (N.C. 1978) (explaining general intent as intent to perform an act and specific intent as intent to accomplish a particular purpose).

The district court mistakenly assumed that North Carolina law requires specific intent, relying on *Blackburn v. Carbone*, a non-binding intermediate appellate decision that defined obstruction as an act undertaken *for the purpose of* hindering justice. 703 S.E.2d 788, 796 (N.C. Ct. App. 2010). But the Supreme Court of North Carolina has not required specific intent in its two decisions recognizing common-law obstruction of justice, defining the claim to include "any act" that hinders justice. *Kivett*, 309 S.E.2d at 462; *see also Henry v. Deen*, 310

55

S.E.2d 326, 334 (N.C. 1984). Other North Carolina decisions similarly have not required specific intent. *See Grant*, 645 S.E.2d at 855 (N.C. Ct. App. 2007). Moreover, *Blackburn* borrowed its "for the purpose of" language from a case interpreting a criminal statute that expressly required specific intent. 703 S.E.2d at 795 n. 6 & 796 (citing *State v. Dietze*, 660 S.E.2d 197, 199 (N.C. Ct. App. (2008)). This Court should apply the general-intent standard approved by the Supreme Court of North Carolina rather than *Blackburn*'s specific-intent standard imported from a criminal statute.

In any event, applying either general or specific intent, a reasonable jury could find Dal-Tile acted unlawfully when, in violation of its own email retention policy, it continued destroying relevant ESI even after it knew of possible litigation. Destruction of ESI under an email retention policy may be intentional and deliberate. *Powell*, 591 F.Supp.2d at 821. According to company policy, Dal-Tile should have taken steps to preserve all relevant ESI as early as August 2009, when senior members of Dal-Tile's human resources and legal divisions learned of the situation with Koester and the company consulted outside counsel. JA 239-44. Dal-Tile had a duty at that time to preserve any "evidence [that] may be relevant to anticipated litigation." *Silvestri v. Gen. Motors Corp.¸* 271 F.3d 583, 591 (4th Cir. 2001). At the latest, Dal-Tile should have issued a litigation hold and retained all emails from individuals involved in Freeman's complaint in November 2009, after

Freeman filed her EEOC charge. *See Powell*, 591 F.Supp.2d at 819; *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

Yet Dal-Tile did not issue a litigation hold until August 2010, a year after the company knew of Freeman's potential litigation. JA 568. Had Dal-Tile issued a litigation hold in August or November 2009 relevant emails from as early as May 2009 would have been retained, covering the period including both the "nigger's checkbook" and "black bitch over at Marble Point" epithets. Instead, due to Dal-Tile's retention policy and the delay in implementing a litigation hold, the company destroyed email records dating to that period from Wrenn, Diksa, Maslowski, and others.  JA 571. Inexplicably, Dal-Tile removed the already-tardy litigation hold in October 2010 as to Diksa—who conducted the company's investigation—leading to loss of additional ESI. JA 571. Given Dal-Tile's failure to follow its own policy and the widely recognized duty to preserve documents, a reasonable jury could find that Dal-Tile acted with the necessary intent when it destroyed relevant emails.

The district court also erred in holding that Freeman did not show that she "was actually harmed" because her "claim could not be proved without multiple levels of speculation or guesswork." JA 639-40. But it is undisputed that Dal-Tile destroyed all email records from the period when the company investigated Freeman's harassment complaint, aside from a few retained by Diksa or Belden.

57

Wrenn acknowledged that she sent "important" material via email to Diksa during that period, including updates on Freeman and Koester. JA 279. Her emails to Diksa could have shown, for example, whether Wrenn reported to Diksa that Dal-Tile's remedial efforts were inadequate to protect Freeman and could have demonstrated that management long knew of Koester's harassment and still failed to act. Although we cannot know the exact contents of the ESI due to Dal-Tile's malfeasance, it is undisputed, not speculative, that relevant emails were destroyed.

The district court similarly erred in granting summary judgment on the basis that Freeman "made no attempt to quantify the amount of her actual damages." JA 640. The court mistakenly held that "proof of damages must be made with reasonable certainty," JA 639, but certainty is not required at summary judgment. None of the three cases on which the district court relied was at the summary-judgment stage or involved obstruction of justice. *See* JA 639 (citing *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 356 S.E.2d 578, 585 (N.C. 1987) (appeal from bench trial); *Lieb v. Mayer*, 94 S.E.2d 658 (N.C. 1956) (appeal from a jury verdict); *Norwood v. Carter*, 87 S.E.2d 658 (N.C. 1955) (appeal from jury trial)). Here, as in most cases, damages are a jury question. Freeman has alleged that she "suffered actual damages including, but not limited to, all damages Plaintiff could have recovered had she received the evidence to which she was entitled," JA 28 ¶ 92, and her claim is therefore sufficient to survive summary judgment.

58

## CONCLUSION

This Court should reverse the district court's decision on all of Ms.

Freeman's claims and remand for a jury trial.

Respectfully submitted,

s/ Anne W. King_____
Anne W. King
Brian Wolfman
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W., Suite 312
Washington, DC 20001
(202) 662-9546
ak682@law.georgetown.edu

*Counsel for Appellant*[*]

---

[*] Counsel gratefully acknowledges the substantial assistance of Peter Klym, Cain Norris, and Garrett Thomas, third-year law students at Georgetown University Law Center, who played key roles in preparing this brief.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument under Federal Rule of Appellate Procedure 34(a)(1). The decisional process will be significantly aided by oral argument, which would allow the Court, among other things, to explore the relationship between the complex factual record and this Court's case law concerning Title VII and section 1981 hostile-work-environment claims. Moreover, this Court has not yet considered the North Carolina common-law question presented by this appeal, and oral argument will allow the Court to more fully explore the issue.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32
(a)(7)(B) because this brief contains **13,241** words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1). This brief
complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type
style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared
in 14-point Times New Roman, a proportionally spaced typeface.

s/ Anne W. King_____
Anne W. King
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W., Suite 312
Washington, DC 20001
(202) 662-9546
ak682@law.georgetown.edu

# STATUTORY ADDENDUM

**42 USC § 1981 – Equal rights under the law**

(a) Statement of equal rights

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

1A

**42 USC § 2000e–2 – Unlawful employment practices**

(a) Employer practices

It shall be an unlawful employment practice for an employer—

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

[…]

**42 USC § 2000e–5 – Enforcement provisions**

[…]

(f) Civil action by Commission, Attorney General, or person aggrieved; preconditions; procedure; appointment of attorney; payment of fees, costs, or security; intervention; stay of Federal proceedings; action for appropriate temporary or preliminary relief pending final disposition of charge; jurisdiction and venue of United States courts; designation of judge to hear and determine case; assignment of case for hearing; expedition of case; appointment of master

> (1) If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d) of this section, the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. If a charge filed with the Commission pursuant to subsection (b) of this section, is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge

>> (A) by the person claiming to be aggrieved . . .

3A

[…]

(3) Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.

[…]

(j) Appeals

Any civil action brought under this section and any proceedings brought under subsection (i) of this section shall be subject to appeal as provided in sections 1291 and 1292, title 28.

**29 C.F.R. § 1604.11**

(a) Harassment on the basis of sex is a violation of section 703 of title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

(b) In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

(c) [Reserved]

(d) With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

(e) An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.

(f) Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under title VII, and developing methods to sensitize all concerned.

(g) Other related practices: Where employment opportunities or benefits are granted because of an individual's submission to the employer's sexual advances or requests for sexual favors, the employer may be held liable for unlawful sex discrimination against other persons who were qualified for but denied that employment opportunity or benefit.

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2013, I electronically filed the foregoing

Brief of Appellant Lori Freeman with the Clerk of court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users, appellee Dal-Tile Corporation's attorneys of record:

Kristine M. Sims (ksims@constangy.com)

William J. McMahon IV (bmcmahon@constangy.com)

s/ Anne W. King_____
Anne W. King
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, N.W., Suite 312
Washington, DC 20001
(202) 662-9546
ak682@law.georgetown.edu